IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 09-137 |
| ALFREDERICK JONES | : | |

**SURRICK, J.**                                                              SEPTEMBER  16 , 2009

## MEMORANDUM

      Presently before the Court are the Government's Motion to Admit Tape Recordings (Doc. No. 18), Defendant's Motion to Dismiss the Indictment (Doc. No. 26), and Defendant's Motion to Compel (Doc. No. 27). For the following reasons, the Government's Motion will be granted, Defendant's Motion to Dismiss the Indictment will be denied, and Defendant's Motion to Compel will be granted in part and denied in part.

**I.      BACKGROUND**

      On March 4, 2009, Defendant was indicted on two counts of distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Counts One and Two). (Doc. No. 1.) On March 30, 2009, the Government filed a Motion to Admit Tape Recordings. (Doc. No. 18.) No response was filed by Defendant. On May 18, 2009, Defendant filed a Motion to Dismiss the Indictment (Doc. No. 26) and a Motion to Compel (Doc. No. 27). The Government filed responses to Defendant's Motions on June 8, 2009. (Doc. Nos. 28, 29.)

      A hearing was held on the Motions on July 9, 2009. At the hearing, the Government presented testimony from ATF Special Agent Jenna Motzenbecker (Hr'g Tr. 1-76, July 9, 2009), and counsel made argument on the Motions. The Motions are now ripe for disposition.

## II.     DISCUSSION

### A.     Government's Motion to Admit Tape Recordings (Doc. No. 18)

The Government seeks to admit an audio tape recording of a conversation that took place on October 24, 2007, between Defendant and a confidential informant ("CI").  (Doc. No. 18.) The CI, whose identity is known to Defendant and to the Court, will be testifying at trial.  At the hearing, Defendant advised that he does not oppose the Government's Motion to Admit Tape Recordings.[1]  Accordingly, the Government's Motion will be granted.

### B.     Defendant's Motion to Dismiss the Indictment (Doc. No. 26)

Defendant moves to dismiss the indictment on the grounds that Special Agent Motzenbecker lied to the grand jury, that AUSA Ewald Zittlau suborned perjury by allowing the agent to testify falsely, and that AUSA Zittlau's failure to either play the recorded conversation or read the transcript of the conversation took away the independent function of the grand jury.

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  "To find prejudice, the district court must establish that the [non-constitutional] violation substantially influenced the grand jury's decision to indict, or . . .

---

[1] At one point during the hearing, upon learning that the Government was admitting into evidence a copy of the tape recording (as opposed to the original), Defendant raised a concern that the copied tape recording differed from the original tape recording.  (*See* Hr'g Tr. 35-37.) The Government advised that the original tape recording was identical to the copied tape recording being submitted as evidence and to the copy provided to Defendant during discovery. (*Id.* at 37.)  The Court directed defense counsel to arrange with the Government to listen to both the original and the copied versions of the tape recording and to report back to the Court on whether Defendant continued to raise an objection on this issue.  (*Id.* at 37-38, 73.)  After discussion between the parties, the Court was advised that Defendant does not object to the copy of the tape recording that the Government intends to admit at trial.  (*See* Letter from Arnold C. Joseph to the Court (Sept. 2, 2009) (located in Chamber's file).)

[that] there is grave doubt that the decision to indict was free from the substantial influence of such violations." *United States v. Soberon*, 929 F.2d 935, 939-40 (3d Cir. 1991) (quoting *Bank of Nova Scotia*, 487 U.S. at 256) (internal quotation marks omitted). "[T]he presentation of . . . allegedly perjured testimony to the grand jury does not fall into the narrow category of cases in which dismissal of charges without a showing of prejudice is warranted." *Id.* at 940.

      1. *Special Agent Motzenbecker's Testimony Before the Grand Jury*

Defendant alleges that Special Agent Motzenbecker made three distinct false statements before the grand jury. We will review each statement separately.

      (a) Business Transaction

Defendant contends that Special Agent Motzenbecker lied in the following exchange with a grand juror:

> A JUROR: The audio recording that you have of the C.I. and Mr. Jones, on the audio recording is there actually discussion of them performing a business transaction?
>
> THE WITNESS [Special Agent Motzenbecker]: Yes.

(Doc. No. 26, Ex. A at 13-14 (Grand Jury Tr., Mar. 4, 2009).) Defendant approaches this alleged instance of false testimony from two angles. Defendant first argues that "[a] review of the audio recording and the transcript provided to Mr. Jones by the Prosecution make [sic] clear that Motzenbecker's testimony . . . that there was 'actually discussion of them performing a business transaction' during the October 24, 2007 meeting, [was] without question false, misleading and prejudicial." (Def.'s Mem. of Law, Doc. No. 26 at 4.) Defendant also argues that when the Special Agent Motzenbecker testified before the grand jury, she did so based upon her Report of Investigation (*see* Doc. No. 26, Ex. B ("ROI # 3")) and a rough draft transcript of the recorded

3

conversation, which did not reflect that a drug transaction had occurred (Hr'g Tr. 28-29).

Defendant's argument that the tape recording did not reflect a business transaction is refuted by the tape recording itself. The following exchanges took place on the October 24, 2007 tape recording:

>JH [CI]:   I don't know man. You got me having [UI]?
>
>FJ [Defendant]:   You don't want it? You ain't gotta get it. It's ain't no biggie.
>
>JH:   No, no, no. I want it. I mean it's tight though, right?
>
>FJ:   Come on man, I ain't going to play no games with you like that. You think that I'm going to run around here selling shit to people that ain't tight? Mother fucker just bought four of them. You think I'm playin' games with this shit? I ain't into that. I know what it is. I wouldn't be driving around in no mother fucking 08 if this mother fucking shit ain't tight.
>
>JH:   Yeah.
>
>FJ:   I'm not giving you nothin. You can smell the shit right through the joint.
>
>JH:   Um, [UI]
>
>FJ:   I wouldn't do that shit [UI] right back to you. There's something wrong with it [UI] here you go. But I know there ain't nothing wrong with it.
>
>. . . .
>
>JH:   Now, what's your count?
>
>FJ:   What I said?
>
>JH:   Yeah.
>
>FJ:   Sixty one, yeah. I gotta make a hundred dollars off you man.
>
>JH:   [UI]
>
>FJ:   Just a hundred dollars off your [sic] right? See how nice I am man?

> JH: No, no.
>
> FJ: See how nice I am, man?
>
> JH: I said, you shouldn't make nothing off of me man.
>
> FJ: [Laughing] I'm not makin' nothing.

(Gov't Ex. 1 at 6, 8; Doc. No. 30 at 6, 8.) This conversation is contained in the final transcript submitted by the Government in response to Defendant's Motion to Dismiss Indictment, and admitted as Government Exhibit 1 at the hearing.[2] Special Agent Motzenbecker testified that she

---

[2] It appears that there was a misunderstanding between the parties concerning the transcript of the October 24, 2007, tape recording. Defendant's Motion to Dismiss the Indictment referenced the rough draft transcript of the conversation, rather than the final transcript that the Government attached to its response and submitted at the hearing. At the hearing, Defendant indicated that he was not aware that his rough draft version was not the final draft of the transcript. (Hr'g Tr. 25-26.) The Government advised that when it sent Defendant the rough draft version on April 24, 2009, it indicated in a cover letter that the transcript being produced was a rough draft. (*Id.* at 28.) On May 22, 2009, after receiving Defendant's Motion to Dismiss the Indictment, Special Agent Motzenbecker and the CI reviewed the tape recording and the rough draft and created the final draft of the transcript. (*Id.*) The Government then submitted this final transcript to the Court and to Defendant on June 8, 2009. (*Id.*)

In addition, Defendant appeared to raise a concern on cross-examination with regard to the accuracy of the final transcript. Defendant stated that the rough transcript, which Defendant contends does not contain evidence of a drug transaction, was produced by a "neutral transcription company." (*Id.* at 51.) The implication is that the final transcript, which does contain evidence of a business transaction and which was created by Special Agent Motzenbecker and the CI, is inaccurate. However, Defendant does not directly dispute the accuracy of the final transcript.

Moreover, we note that even the rough draft transcript has language suggestive of a business transaction:

> JH: I don't know man. You got me having [UI]?
> FJ: Say that, say that again [UI].
> JH: No, no, no [UI] I mean it's tight though.
> FJ: No man, I ain't [UI] playin no games or shit like that. You shake that little ass. Sho, telling people it ain't tight. Mother fucker it's more fuller. You think I'm, I'm playin games with you? I know, I won't be trying around those mother fuckers no eighties mother fuckers shit ain't tight.
> JH: Yeah.

5

understood Defendant's mention of "sixty one" to be a reference to the price of nine ounces of cocaine that the CI intended to purchase. (Hr'g Tr. 34, 46-47.) The CI was given $8000 to purchase the cocaine, and returned to the agents with $1900, the difference in amounts being $6100. (*Id.*) Special Agent Motzenbecker further testified that in her experience as an agent, this conversation indicated that a drug transaction was taking place. (*Id.* at 33.)

Defendant argues that Special Agent Motzenbecker should not be permitted to testify based upon the final transcript that was prepared on May 22, 2009. The argument makes little sense. At the hearing, Special Agent Motzenbecker testified that when she answered the grand juror's question, she was testifying based upon her memory of what she heard during the actual transaction and based upon her investigative reports. (*Id.* at 31-32, 40.) She explained that she had listened to the transactions between the CI and Defendant as they occurred by means of transmitter worn by the CI. (*Id.* at 21-22.) The final transcript simply reflects what is on the tape and what Special Agent Motzenbecker actually heard.

Special Agent Motzenbecker's testimony was completely credible. It is clear that she did

---

FJ:   I might give you one you can smell the shit right through the joint.
. . . .
JH:   Now, what's our count?
FJ:   What I said?
JH:   Yeah.
FJ:   Sixty one, yeah. I gotta take a hundred dollars off you man.
JH:   [UI]
FJ:   Just a hundred dollars off you right? See how nice I am man?
JH:   No, no.
FJ:   See how nice I am, man?
JH:   I said, you're not helping me, man.

(*see* Doc. No. 26, Ex. B at 6, 8.) We are satisfied that there was no misconduct on the part AUSA Zittlau and Special Agent Motzenbecker with regard to the production and transcription of the transcripts.

6

not lie when she told the grand jury, in response to a grand juror's question, that the audio tape recording reflected the CI and Defendant engaging in a business transaction.

(b)   Re-upping

Defendant argues that Special Agent Motzenbecker also lied to the grand jury with regard to certain statements allegedly made by Defendant:

> In ROI 5 Agent Motzenbecker reported that during the meeting between the CI and Jones that Jones told the CI "Jones should be getting 're-uped' by his supplier within the next week". [sic] See Ex. B paragraph 8.[3]
> . . .
>
> The transcript of the 13-minute conversation between the CI and Jones, however, belies Agent Motzenbecker's assertion insofar as Jones does not make any such statement during his conversation with the CI. See Ex. C.

(Def.'s Mot., Doc. No. 26 ¶¶ 12, 14.)  Defendant is confused.  Special Agent Motzenbecker was not testifying about the audio-recorded October 24, 2007, conversation when she testified before the grand jury that "[t]he C.I. stated that Jones should be getting re-upped by his supplier within the next week." (Grand Jury Tr. 12.)  Rather, she was testifying about her debriefing of the CI following a second transaction with Defendant on November 2, 2007.  There is no audio recording of the November 7, 2007, transaction or the debriefing session. (*See* Doc. No. 29 at 4 ("The government notified the defendant weeks in advance of his filing of the present motion to dismiss indictment that the audio tape recording equipment malfunctioned on November 2, 2007 and therefore there is no audio recording or corresponding transcript for the November 2, 2007

---

[3] Defendant references ROI # 5, but cites to paragraph 8 of Exhibit B, which is ROI # 3. Paragraph 8 of ROI # 3 states that the substance that the CI purchased from Defendant was turned over to a federal agent, who conducted a field test and found that the substance tested positive for the presence of cocaine.  (*See* Doc. No. 26, Ex. B ¶ 8.)  Neither party submitted a copy of ROI # 5 to the Court.

7

cocaine transaction between the CI and the defendant.").)  Defendant is simply incorrect when he argues that the transcript of the October 24, 2007 transaction demonstrates that Special Agent Motzenbecker lied.

Defendant also contends that the following statement made by Special Agent Motzenbecker to the grand jury was a lie:

> S.A. Motzenbecker and Agent Caraway debriefed the C.I.  The C.I. stated that Jones said he is almost out of product and is getting his money together to get more.  Jones told the C.I. that he could get whatever the C.I. needed in the future.  The C.I. will continue to stay in contact with Jones.

(Grand Jury Tr. 7; *see also* Doc. No. 26, Ex. B ¶ 9 ("ROI # 3").)  At the hearing, Defendant argued that this purported statement by Defendant to the CI is not reflected in the language of either the rough or final drafts of the October 24, 2007, conversation transcript.  (Hr'g Tr. 52-53.)  Defendant argued that since the entire transaction was recorded, and because the Agent listened to the entire transaction between Defendant and the CI and did not hear this discussion, she knew that it was untrue when she relayed the information to the grand jury.  (*Id.* at 56-57.)  Special Agent Motzenbecker testified that the CI told her that Defendant said this before the actual meet.  (*Id.* at 53.)  Moreover, as the Government argued, what the CI told the Agent about there being future cocaine available for sale proved to be true, because within a week there was another drug transaction between the CI and Defendant.  (*Id.* at 59.)

We are satisfied that Special Agent Motzenbecker did not lie to the grand jury with regard to the October 24, 2007, re-supply discussion.  Special Agent Motzenbecker testified that the CI told her that Defendant told him about the future cocaine sales prior to their tape-recorded meeting.  There was clearly a prior conversation between the CI and Defendant on October 24,

2007, for which we do not have a transcript.  Special Agent Motzenbecker's ROI states in reference to this prior conversation:  "On 10/24/07, at approximately 11:18 am, JONES contacted CI-327 and told the CI that he has three 4.5's left and to let him know when he/she was ready.  The CI told JONES that he/she was still getting the money together but that he/she would still want the nine (9) ounces they had discussed."  (Doc. No. 26, Ex. B ¶ 1.)

The record reflects that Special Agent Motzenbecker did not lie to or otherwise mislead the grand jury as Defendant alleges.  We are satisfied that there was absolutely no misconduct by the Agent.

>    2.    *AUSA's Conduct Before the Grand Jury*

Defendant argues that AUSA Zittlau's alleged misconduct before the grand jury necessitates dismissal of the indictment.  Defendant argues that by AUSA Zittlau knowingly allowed Special Agent Motzenbecker to testify falsely before the grand jury, and that he failed to correct the misstatements.  (Def.'s Mot., Doc. No. 26 ¶¶ 18-20.)  We reject Defendant's assertions.  The record reflects that Special Agent Motzenbecker did not lie before the grand jury, and AUSA Zittlau did not suborn perjury.  Defendant's arguments are without merit.

Defendant also argues that "[o]ne does not need to speculate to reach the logical conclusion that Agent Motzenbecker's lies coupled with AUSA Zittlau's failure to either play the recording or read the transcript to the Grand Jury took away the independent function of the Grand Jury."  (Def.'s Mot., Doc. No. 26 ¶ 22.)   We are aware of no authority, and Defendant has cited none, that would require an Assistant United States Attorney to play the audio recording of a drug transaction or read the transcript of the audio recording to a grand jury.

We are satisfied that AUSA Zittlau was not guilty of prosecutorial misconduct.

9

### C. Defendant's Motion to Compel (Doc. No. 27)

Defendant also moves to compel the production of "all documents which refer or relate to [the] Confidential Informant's participation in other investigations and a complete un-redacted copy of the PSI report prepared for the Confidential Informant . . . ." (Def.'s Mot., Doc. No. 27 at 1.) As the basis for these requests, Defendant advises that in discovery, the Government provided four pages of information from a presentence investigation report ("PSR") for the CI. (*Id.* ¶ 6.) Defendant requests the remaining pages of the PSR "insofar as it will obviously contain other information which will assist in casting light on the CI's background, his possible exposure and the benefits bestowed on him by the Government in exchange for agreeing to testify against [Defendant]." (*Id.* ¶ 8.)

Defendant also asserts that between the incidents in October and November 2007, which form the basis of the indictment against Defendant, and the indictment of Defendant in March 2009, the CI worked with the Government on other investigations. (Hr'g Tr. 7.) In his Motion to Compel, Defendant asked for "information about other investigations in which the CI has offered and/or provided assistance to the Government." (Def.'s Mot., Doc. No. 27 ¶ 9.) At the hearing, Defendant argued that he is "entitled to know exactly what [the CI] was doing for the Government during that period of time, what other investigations he was involved in, whether they were fruitful or not, whether or not maybe a trial took place, and [whether] it was determined that [the CI] was lying with respect to another investigation." (Hr'g Tr. 8.) Defendant suggested that this information could be contained in the PSR, in government agents' "302's," and in other documents. (*Id.*) Defendant argues that because the CI is the linchpin of the Government's case, Defendant needs all of this information to defend against the

Government's allegations. (*Id.* at 9.) During the hearing, Defendant limited the request for information to other investigations involving the CI conducted over the last 12 to 18 months. (*Id.* at 15.)

The Government responds that the following information about the CI was disclosed to Defendant:

- copy of the CI's plea agreement;

- the CI's prior criminal record (as compiled in the PSR);

- record of payments from ATF;

- form showing what monies were paid to the CI when utilized as a CI by ATF;

- fact that the CI is classified as a career offender, and that he faces a Sentencing Guideline Range of 188 to 235 months imprisonment (as calculated in the PSR);

- precise dollar amounts incurred by the ATF and the U.S. Attorney's Office in relocating the CI and his family for their protection and safety;

- identity of the CI;

- reports concerning the CI's use of another name, as well as an identification that he had in that name.

- the CI's change of plea memorandum; and

- notice under 21 U.S.C. § 851 that the CI faces enhanced sentencing from 20 to 30 years on the two drug counts to which he entered guilty pleas.

(*Id.* at 10-12.) In addition, the Government advises that it has disclosed to Defendant all *Brady* and *Giglio* material that the Government has, and that it reviewed the PSR and disclosed any *Brady* or *Giglio* material contained in the PSR. (*Id.* at 9, 11.) The Government argues, however, that Defendant is not entitled to the full PSR because it is a confidential document. (*Id.* at 9.) The Government further argues that information about any other work that the CI has done as a

11

government informant, including the targets of investigations in which the CI has assisted, is irrelevant and not discoverable by Defendant. (*Id.* at 11.)

### 1. CI's Full PSR

Defendant argues that he is entitled to the CI's full PSR because it will contain information about the subject's criminal history (which Defendant admits was already produced by the Government), as well as "facts and circumstances of the crime that is the subject of the presentence investigation report," "family background," and "certain recommendations of the Probation Department, with respect to the Sentence Guidelines Range." (Hr'g Tr. 5-6.)

Based upon the Government's representations, it would appear that Defendant has received all information from the PSR that he is entitled to receive. "There is a general presumption that courts will not grant third parties access to the presentence reports of other individuals." *United States v. Blanco*, 884 F.2d 1577, 1578 (3d Cir. 1989) (citing *U.S. Dep't of Justice v. Julian*, 486 U.S. 1 (1988)). "Accordingly, the courts have typically required some showing of special need before they will allow a third party to obtain a copy of a presentence report." *Julian*, 486 U.S. at 12 (citing *United States v. Charmer Indus., Inc.*, 711 F.2d 1164, 1174-76 (2d Cir. 1983)). The standard for disclosure of PSRs varies among the circuits. For example, the Second Circuit has held that

> when a co-defendant requests the presentence report of an accomplice witness, the district court should examine the report in camera to determine if there are any statements made by the witness that contain exculpatory or impeachment material. If there is any such material, the judge should not release it unless there is a "compelling need for disclosure to meet the ends of justice."

*United States v. Moore*, 949 F.2d 68, 72 (2d Cir. 1991) (referencing *Charmer*, 711 F.2d at 1174). In the Seventh Circuit, "[o]nly where a compelling, particularized need for disclosure is shown

should the district court disclose the report; even then, however, the court should limit disclosure to those portions of the report which are directly relevant to the demonstrated need." *United States v. Corbitt*, 879 F.2d 224, 239 (7th Cir. 1989).  Moreover, a threshold showing must be made to obtain an *in camera* review.  In the Second Circuit, "no *in camera* review of a co-defendant's PSR is required without a threshold showing of good faith belief that a co-defendant's PSR contains exculpatory evidence not available elsewhere." *United States v. Molina*, 356 F.3d 269, 275 (2d Cir. 2004).  In the Fourth Circuit,

> a district court is under no duty to conduct an *in camera* examination of a requested PSR unless the accused has first clearly specified the information contained in the report that he expects will reveal exculpatory or impeachment evidence.
> . . . .
>
> [A]s a prerequisite to an *in camera* review, an accused must plainly articulate how the information contained in the PSR will be both material and favorable to his defense.

*United States v. Trevino*, 89 F.3d 187, 192-93 (4th Cir. 1996).

Here, the Government represents that it has already disclosed all relevant exculpatory and impeachment information from the CI's PSR.  Defendant has made no showing of a special need that would justify disclosure of the remainder of the PSR.  Nor has Defendant made a showing to justify *in camera* review of the PSR.  Accordingly, Defendant's request for disclosure of the CI's full PSR is denied.  *See United States v. Solomon*, No. 05-385, 2007 U.S. Dist. LEXIS 21433, at *19-20 (W.D. Pa. Mar. 26, 2007) (denying the defendants' request for disclosure of PSRs and declining to review the PSRs *in camera* where the defendants sought impeachment material from government witnesses' PSRs and where the government acknowledged that it would disclose all impeachment and exculpatory information contained in the PSRs).

### 2. Other Investigations

With regard to Defendant's second request, Defendant is not entitled to all information relating to other investigations in which the CI has assisted. "There is no general constitutional right to discovery in a criminal case and *Brady* did not create one . . . ." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). To the extent that Defendant is requesting general information with regard to the CI's other activities with the Government, Defendant's request is denied.

At the hearing, the Court inquired as to whether information showing that the CI had lied or not been candid during prior encounters with authorities, including other investigations in which the CI was involved, would constitute *Brady* or *Giglio* material. (Hr'g. Tr. 12-13.) *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150, 154 (1972)*,* require that the government turn over exculpatory and impeachment materials in its possession to defendants. The Government responded that Defendant is just speculating that the CI had lied, and that in order to determine whether the CI had lied in other investigations, the Government "would have to go through everything he's ever told the ATF . . . ." (*Id.* at 13.)

Defendant argues that the Government allowed the CI to remain on the street in order to develop cases against Defendant and others, that the CI is facing a lifetime imprisonment, and that the CI "had a clear and important motive to give the Government what they wanted so that he could remain on the streets." (*Id.* at 16.) Defendant suggests that the CI had a clear motive to lie.

We have found no cases directly addressing this issue. However, several cases are instructive. In *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997), the defendant claimed that there was constitutional error at trial based upon the state's withholding of a cooperating

witness's Department of Corrections file. The Ninth Circuit reversed the defendant's judgment of conviction, finding that the witness at issue was the prosecution's star witness, that he was a known criminal, and that "[w]hen the state decides to rely on the testimony of such a witness, it is the state's obligation to turn over all information bearing on that witness's credibility." *Id.* at 480. The court held that "[t]he state had an obligation, before putting [the witness] on the stand, to obtain and review [the witness's] corrections file, and to treat its contents in accordance with the requirements of *Brady* and *Giglio*." *Id.* Among the items of evidence that the court found cumulatively to be material to the witness's credibility was information in the state's files that showed: (a) "that [the witness] had in the past falsely accused police officers of keeping money they recovered from him after arresting him for burglary;" (b) "that [the witness] had falsely denied a burglary and falsely accused the police of lifting his fingerprints from a water glass and lying about it;" (c) "that [the witness] had also denied ever being involved in bank robberies;" and (d) "that after committing a 1976 commercial burglary, [the witness] had immediately approached police on his own initiative and attempted to blame the burglary on another." *Id.* at 480-81. The court found that evidence of the witness's "history of lying to the police and blaming others to cover up his own guilt" was particularly relevant to the witness's credibility. *Id.* at 481.

In a recent opinion, the Court of Appeals for the Tenth Circuit reversed a defendant's conviction and remanded for a new trial where the government failed to disclose, among other things, "evidence demonstrating the CI's breach of a prior agreement with the DEA . . . ." *United States v. Torres*, 569 F.3d 1277, 1283 (10th Cir. 2009). Undisclosed evidence that "came to light in a related case" showed that "the CI had been retained by the Drug Enforcement

Administration ('DEA') as an informant on two prior occasions . . . ." *Id.* at 1280. The CI was "de-activated" from her first contract with the DEA as a result of a forgery charge being brought against her. *Id.* The court found that "[t]he government's near-total reliance on the testimony of the CI to establish that [the defendant] was indeed the person participating in the controlled buy requires a new trial." *Id.* at 1284.

      These cases support the proposition that information that shows that a government witness has lied to authorities in the past qualifies as impeachment material under *Brady* and *Giglio*. Such information that is actually or constructively in the Government's possession or accessible to it must be turned over to defendants. *See United States v. Perdomo*, 929 F.2d 967, 970-71 (3d Cir. 1991) (finding that "non-disclosure is inexcusable where the prosecution has not sought out information readily available to it," as measured by "whether the information is in the possession of some arm of the state"). Moreover, "the prosecution's duty to disclose is [not] limited to evidence within the actual knowledge or possession of the prosecutor. It is well-settled that the prosecution has a duty to learn of and disclose information 'known to the others acting on the government's behalf in the case . . . .'" *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). For example, "a federal prosecutor is charged with knowledge of information possessed by other agents of the federal government when those agents are part of a prosecution team, which includes federal personnel involved in the investigation as well as the prosecution of a case." *Id.* (internal quotation marks omitted). With regard to information in files unrelated to the substantive case file, however, the Third Circuit has held that it "will not interpret *Brady* to require prosecutors to search their unrelated files to exclude the possibility, however remote, that they contain exculpatory

16

information." *United States v. Joseph*, 996 F.2d 36, 41 (3d Cir. 1993). Therefore,

> where a prosecutor has no actual knowledge or cause to know of the existence of *Brady* material in a file unrelated to the case under prosecution, a defendant, in order to trigger an examination of such unrelated files, must make a specific request for that information – specific in the sense that it explicitly identifies the desired material and is objectively limited in scope.

*Id.*; *see also id.* (finding that the defendant did not make a requisite "specific request" where the "appellants' general request for *Brady* material certainly did not ask the prosecutor to make a search of reasonable scope for the appellants did not focus on the file or call the prosecutor's attention to the specific particulars of the information sought or where he could find the material").

Here, Defendant has requested information in the files of other investigations in which the CI has assisted which demonstrates that the CI has lied to investigators, authorities, or the courts. Defendant has also limited his request in terms of time: Defendant seeks *Brady* and *Giglio* material from investigations involving the CI that took place within the last 12 to 18 months. This is not an unreasonable request. We direct the Government to review the files of the cases involving the CI for the period between the beginning of the CI's involvement in Defendant's case, in October 2007, and Defendant's indictment in March 2009 and to provide Defendant with any *Brady* or *Giglio* material contained in those files. Since the Government is concerned about disclosing information from other investigations that may be ongoing or where the CI's identification has not been revealed, the Government may submit any such *Brady* or *Giglio* material from the unrelated files to the Court for *in camera* review. The Court will then determine whether or not the information needs to be disclosed to Defendant, in light of the Government's need for secrecy as weighed against the Defendant's need for the evidence.

## III.      CONCLUSION

For the foregoing reasons, we will grant the Government's Motion to Admit Tape Recordings, we will deny Defendant's Motion to Dismiss the Indictment, and we will grant in part and deny in part Defendant's Motion to Compel.

An appropriate Order will follow.

BY THE COURT:

_____
R. Barclay Surrick, J.